UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALEXANDER FARNSWORTH,

                Plaintiff,

v.

CITY OF GENEVA et al.,

                Defendants.

Case # 20-CV-06935-FPG

DECISION AND ORDER

## INTRODUCTION

Plaintiff Alexander Farnsworth brings this civil rights action against the City of Geneva, the City of Geneva Police Department ("GPD"), City of Geneva Chief of Police Michael J. Passalacqua, Police Officer Jack Montesanto, Police Officer Ryan Camacho, Police Officer Richard Baskin, and Sgt. William Belowicz (the "Geneva Defendants"). Plaintiff alleges excessive force, false arrest, deliberate indifference to physical harm, deliberate indifference to safety/medical needs, negligence, negligent hiring and retention, respondeat superior, and failure to intervene. ECF No. 18. Defendants move for summary judgment. ECF No. 51. Plaintiff opposes the motion. ECF No. 55. For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether

genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

Among the evidence proffered by the parties is video footage—taken from various GPD officers' bodycams—of the encounter between Plaintiff and GPD as well as between Karry Farnsworth, her son, "D.C.", and GPD. Video footage can, but does not always, conclusively establish facts for purposes of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 379–80 (2007); *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017). Where a videotape "leaves no doubt as to what occurred," *United States v. Paul*, 904 F.3d 200, 203 (2d Cir. 2018), a district court need not countenance contrary factual assertions. *See Scott*, 550 U.S. at 380; *Heicklen v. Toala*, No. 08-CV-2457, 2010 WL 565426, at *2 (S.D.N.Y. Feb. 18, 2010).

Conversely, if the video evidence is "ambiguous" or otherwise inconclusive, *Hicks v. Vill. of Ossining*, No. 12-CV-6874, 2016 WL 345582, at *5 (S.D.N.Y. Jan. 27, 2016), a court must employ its usual summary judgment standards and construe the evidence in the non-moving party's favor. *Accord Hulett*, 253 F. Supp. 3d at 482 ("[W]hile the video evidence submitted by the parties will certainly be considered and carefully reviewed at this juncture, ... summary adjudication of a plaintiff's civil rights claim [is permitted] only in those exceptional cases where the video evidence in the record is sufficient to blatantly contradict one party's version of events." (internal quotation marks and brackets omitted)).

2

The incidents that gave rise to the present action occurred on the night of June 23, 2019. The bodycam footage begins with GPD officers arriving at 14 Clinton Street in Geneva. Police were responding to a 911 call by a female screaming help before the line disconnected. ECF No. 55-6 at 1–2. The officers who initially responded to the scene were Camacho, Hickey, and Sgt. Felice. *Id.* The bodycam footage shows that upon their arrival, the officers encounter a visibly distraught Karry Farnsworth and D.C. Defs. Ex. M(4) 00:43-01:33. Karry and D.C. soon begin explaining what happened leading up to the 911 call. *Id.* Karry tells police that her son had called her downstairs because Plaintiff was cutting himself. *Id.* She also told police that Plaintiff attacked her, smashed her phone, smashed D.C.'s phone, and smashed D.C.'s Xbox. *Id.* Specifically, Karry alleged that Plaintiff put his hands around her throat and jumped on top of her, and then when she got the Plaintiff off of her, her son tried to help, and Plaintiff began attacking him as well. *Id.*

While some of the officers continue to talk to Karry and D.C., others look for Plaintiff around 14 Clinton Street. ECF No. 55-6 at 3. Sometime after leaving 14 Clinton Street, Plaintiff called 911 and requested to speak with Sgt. Felice. *Id.* at 6. The 911 dispatcher was able to ping the cell phone used by Plaintiff to plot Plaintiff's location to the corner of North Exchange and Gates Avenue. *Id.* Officer Montesanto was the first to arrive at North Exchange Street and Gates Avenue, where Plaintiff was located. *Id.* at 7. Shortly after arriving, Sgt. Bielowicz identified Plaintiff as the suspect, and Officer Montesanto placed Plaintiff in handcuffs. *Id.*

Sgt. Bielowicz's bodycam shows Plaintiff telling Officer Montesanto that the handcuffs are cutting into him and asking Officer Montesanto to loosen them shortly after they are applied. Defs. Ex. M(3) 06:10-06:20. Officer Montesanto responds that he will do so when Plaintiff is taken to the car. *Id.* Initially, Plaintiff appeared to accept that response, saying "alright that's fine," but after about a minute, Officer Camacho's bodycam shows him starting to complain again. *Id.*; Defs. Ex.

3

M(4) 39:20-40:00. Plaintiff repeatedly says "Ow," and says, "seriously that one is cutting into my wrist." Defs. Ex. M(4) 39:20-40:00. Officer Montesanto then adjusts the handcuffs. *Id.* After the adjustment is made, Plaintiff stops his verbal complaints about the handcuffs. *Id.*

Shortly after the handcuffs are readjusted, Officer Montesanto begins to take Plaintiff to Officer Camacho's police vehicle. At this point there is a dispute about what occurred. Plaintiff contends that he was not passively or actively resisting arrest and that Officer Montesanto used unnecessary physical force causing him "to be thrown to the ground and then dragged on the ground to a GPD patrol vehicle." ECF No. 18 at 5. Defendants maintain that Plaintiff was visibly stalling and that he was never forcibly dragged to the ground. ECF No. 55-6 at 9.

Officers Camacho's, Baskin's, and Farmer's bodycams capture the footage of the alleged dragging. Each bodycam offers a different angle of the incident. Putting all of the footage together, it is clear that Plaintiff is never dragged on the ground. *See* Defs. Ex. M(4) 40:50-41:10; Defs. Ex. M(5) 01:30-01:36; Defs. Ex. M(9) 35:20-35:40. Indeed, Plaintiff even said in his first deposition that he was upright during the alleged dragging. *See* ECF No. 51-3 at 46–47. The bodycam footage shows that Plaintiff starts to fall down a couple of times, but the officer prevents him from landing on the ground. *See* Defs. Ex. M(4) 40:50-41:10; Defs. Ex. M(5) 01:30-01:36; Defs. Ex. M(9) 35:20-35:40. It is unclear from the videos what causes Plaintiff to start to fall, but he maintains that it was the force of Officer Montesanto pushing him towards the police vehicle. *See* ECF No. 18 at 5.

Eventually, Plaintiff is placed in Officer Camacho's police vehicle and driven to the GPD station. Once they arrive at the station, Officer Baskin and Officer Camacho go to the back of the vehicle to remove Plaintiff. Defs. Ex. M(4) 46:50-48:00; Defs. Ex. M(9) 41:10-42:25. When they open the door, Plaintiff asks why he is being detained, and Officer Camacho tells him that he is

4

being detained due to a domestic incident. *Id.* Plaintiff then begins to argue with the officers about the charges, and Officer Camacho responds to him. *Id.* Eventually, Officer Camacho says, "we're going inside," and after saying "we're going inside" four times, Officers Camacho and Baskin begin to remove Plaintiff from the police vehicle. *Id.* Plaintiff maintains that at this point, he was not resisting in any way and that Officers Baskin and Camacho began aggressively pulling him from the back seat of the car. ECF No. 18 at 6. Defendants deny this characterization and claim that Plaintiff was verbally and physically resistant to exiting the patrol vehicle, causing the officers to have to escort him from the vehicle. ECF No. 55-6 at 13.

A few seconds after the officers begin to remove Plaintiff from the vehicle, Plaintiff begins to complain about his feet being stuck under the seat. Defs. Ex. M(9) 41:10-42:25. Plaintiff maintains that after he complained about his feet being stuck, the officers continued to pull him from the vehicle forcefully. ECF No. 18 at 6. Defendants again deny this characterization. They claim that as soon as Plaintiff complained that his foot was stuck, they stopped assisting him out of the vehicle. ECF No. 55-6 at 13. Then, once Officer Camacho saw that Plaintiff's foot was stuck in the barrier that separates the front and back of the police vehicle, Officer Camacho removed his foot from the barrier. *Id.* at 13–14.

After his foot is freed, Plaintiff is removed from the car by the officers, and they all begin walking towards the door to the police station. *See* Defs. Ex. M(4) 46:50-48:00; Defs. Ex. M(9) 41:10-42:25. After a few steps, Plaintiff begins to limp. *Id.* He also begins to complain that he is in pain. *Id.* He is taken to a holding cell, and after about ten minutes, he requests to see a doctor. Defs. Ex. M(9) 51:55-52:00. About five minutes later, officers confirm that he would like an ambulance, and Plaintiff tells them that he wants the ambulance for his ankle. Defs. Ex. M(9) 55:00-55:20. About ten minutes later, EMTs arrive. *Id.* at 1:04:50.

5

After completing their initial examination, the EMTs recommended taking Plaintiff to the hospital, and he was transported by ambulance to Geneva General Hospital. ECF No. 55-6 at 16. Plaintiff was treated at the hospital and then discharged to the Ontario County Jail. ECF No. 18 at 7. On June 24, 2019, Plaintiff was arraigned in the Ontario County Centralized Arraignment court on charges of criminal mischief in the third degree, robbery in the third degree, criminal possession of a weapon in the third degree, and strangulation in the second degree. ECF No. 51-29 at 3–6.

On July 1, 2019, while at the Ontario County Jail, Plaintiff complained to staff of severe pain in his lower left leg. ECF No. 55-6 at 21. He also noticed his leg and foot turning black and observed a clot moving through his leg. *Id.* He was immediately rushed to Thompson General Hospital and then to the University of Rochester Medical Center. *Id.* While at the University of Rochester Medical Center, he was diagnosed with a mid-calf occlusion of anterior tibial and personal arteries. *Id.*

On July 6, 2023, Plaintiff underwent a physical examination by Dr. Robert E. Todd. ECF No. 55-5 at 18. Based on his examination and review of the evidence, it is Dr. Todd's opinion that Plaintiff's left leg "developed multiple clots following his arrest, detention in the squad car behind the PRO-GARD partition followed by the forcible extraction" by GPD. ECF No. 55-5 at 18–19. Dr. Todd believes the development of the clots resulted in Ischemic Monomelic Neuropathy, which has caused Plaintiff long-term pain, sensory loss, weakness, muscle atrophy, and abnormal gait. *Id.*

On November 4, 2020, Farnsworth brought the present action in this Court. ECF No. 1. He then amended his complaint on January 3, 2022. ECF No. 18. In his amended complaint, Farnsworth brought three claims against the Ontario County Sheriff's Office, Ontario County Sheriff Kevin M. Henderson, Christian H. Smith, and John Does 1–10 (the "Ontario Defendants").

6

*Id.* He also brought ten claims against the Geneva Defendants. *Id.* After motion practice, only the ten claims against the Geneva Defendants remain.

## DISCUSSION

Defendants move for summary judgment on all ten of Farnsworth's claims against the Geneva Defendants. They also move that the request for punitive damages be stricken.

### I.   First Claim: Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983

The Court grants summary judgment to Defendants on Claim One. Defendants contend that Plaintiff's first claim fails to state a claim due to its duplicity. They argue that the first claim is duplicative of Plaintiff's second, third, fifth, and sixth claims. *See* ECF No. 51-30 at 3. Plaintiff did not respond to Defendants' argument in his Opposition to Defendants' Motion for Summary Judgment (ECF No. 55-7). When a party is counseled, a court may infer from a party's partial opposition—*i.e.,* a response that references some claims or defenses but not others—that relevant claims or defenses not defended in the opposition have been abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014).

Here, Plaintiff is counseled and did not defend this claim in his opposition. Consequently, the Court considers the claim to be abandoned, and Claim One is dismissed.

### II.   Second Claim: Excessive Force Under 42 U.S.C. § 1983

Plaintiff alleges three separate instances of excessive force. First, when he was arrested by Officer Montesanto, he was "placed in handcuffs that were extremely tight." ECF No. 18 at 6. Second, when he was being taken to the GPD patrol vehicle to be transported to the police station, Officer Montesanto used "unnecessary physical force" causing Plaintiff "to be thrown to the ground and then dragged on the ground to a GPD patrol vehicle." *Id.* at 5. Third, when he was removed from the GPD patrol vehicle at the police station, Officers Camacho and Baskin

"aggressively started to pull" Plaintiff from the rear seat while his "foot and/or feet were still stuck underneath the barrier" causing Plaintiff severe pain and injury. *Id.* at 6. Defendants move for summary judgment on each instance, arguing that the force used was not unreasonable and that the officers are entitled to qualified immunity.

The doctrine of qualified immunity shields government officials from civil damages liability unless "the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotation marks omitted). "To determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x 61, 62 (2d Cir. 2017) (summary order) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

"As it relates to the second step, the focus is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (internal quotation marks omitted). The Supreme Court has warned that the use of excessive force "is an area of the law in which the result depends very much on the facts of each case," and general statements of the law "do not by themselves create clearly established law" outside the obvious cases. *Kisela v. Hughes*, 584 U.S. 100, 104–05 (2018) (internal quotation marks omitted) ("[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on

the question of reasonableness."). In other words, specificity "is especially important" in these sorts of cases. *Id.* at 104. Thus, "[a]lthough a case does not need to be directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Estate of Priolo v. City of N.Y.*, No. 15-CV-6080, 2019 WL 1428403, at *4 (E.D.N.Y. Mar. 29, 2019) (internal quotation marks omitted). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force, and thereby provide an officer notice that a specific use of force is unlawful." *Id.* (internal quotation marks omitted).

Each instance of alleged excessive force, and the applicability of qualified immunity, are discussed below.

### a. Handcuffing

With respect to Officer Montesanto's use of handcuffs, the Court concludes that Defendants are entitled to summary judgment. The Court does not address whether Plaintiff has made out a violation of a constitutional right because it concludes that the right was not clearly established at the time of the challenged conduct.

In *Cugini v. City of New York*, the plaintiff brought a § 1983 claim against an officer alleging that he used excessive force when handcuffing her too tightly, which led to permanent nerve damage. 941 F.3d 604, 607 (2d Cir. 2019). In that case, the Second Circuit concluded that that at the time of Cugini's arrest in 2014, excessive force in handcuffing was prohibited by clearly established constitutional law. *Id.* at 615. Nevertheless, it held that the defendant was entitled to qualified immunity because before the decision in that case, it "remained an open question in this Circuit whether a plaintiff asserting an excessive force claim was required to show evidence that an officer was made reasonably aware of her pain by means of an explicit verbal complaint." *Id.*

at 616. It cited its limited case law on the subject, which appeared to view the presence or absence

of a complaint as a significant factor, if not a prerequisite to liability. *Id.* It concluded that after the

day the case was decided, October 25, 2019, officers could no longer rely on qualified immunity

to shield them from liability when "using plainly unreasonable force in handcuffing a person or

using force that they should know is unreasonable based on the arrestee's manifestation of signs

of distress." *Id.* at 617.

In the current case, Plaintiff alleges that Officer Montesanto used excessive force because

he placed Plaintiff in handcuffs that were extremely tight. Shortly after being handcuffed, Plaintiff

told Officer Montesanto that the handcuffs were cutting into him and asked Officer Montesanto to

loosen them. Defs. Ex. M(3) 06:10-06:20. Officer Montesanto responded that he would do so when

Plaintiff was taken to the car. *Id.* Initially, Plaintiff appeared to accept that response, saying "alright

that's fine," but after about a minute, he started to complain again. *Id.*; Defs. Ex. M(4) 39:20-40:00.

He repeatedly said "Ow," indicating that he was in pain, and said "seriously that one is cutting into

my wrist," indicating that the handcuffs were too tight. Defs. Ex. M(4) 39:20-40:00. Officer

Montesanto then adjusted the handcuffs to make them looser. *Id.* After the adjustment was made,

Plaintiff did not make another verbal complaint to Officer Montesanto about the handcuffs. *Id.* In

his deposition, Plaintiff claimed that the handcuffs were still too tight after they were readjusted.

ECF No. 51-11 at 134–35.

The Court may assume that, by the time of Plaintiff's arrest, it was clearly established that

when a suspect has made the officer verbally aware of his pain, the use of unduly tight handcuffs

is a violation of the suspect's right to be free from excessive force. *Cf. Cugini,* 941 F.3d at 615.

However, there was no Second Circuit precedent indicating that there is a constitutional violation

if the suspect remains in pain, but does not verbalize that pain, after an officer readjusts the

handcuffs in response to the suspect's complaints. *See Shen v. City of N.Y.*, 725 F. App'x. 7, 12 (2d Cir. 2018) (summary order) (holding that the district court correctly granted summary judgment on plaintiff's handcuffing excessive force claim in part because officers handcuffed plaintiff in manner that accommodated his shoulder injury in response to his complaints); *Forbes v. Doe*, No. 18-cv-6700, 2024 WL 329080, at *8 (W.D.N.Y. Jan. 29, 2024) (holding that officers did not act unreasonably where they adjusted the plaintiff's "handcuffs on at least two occasions after [he] complained they were too tight"). Thus, Officer Montesanto is entitled to qualified immunity on the claim related to the tight handcuffs.

### b.  Dragging

The Court also concludes that Officer Montesanto is entitled to qualified immunity and therefore summary judgment for the claim related to the alleged dragging. Again, the Court does not address whether Plaintiff has made out a violation of a constitutional right because it concludes that the right was not clearly established at the time of the challenged conduct.

Officers Camacho's, Baskin's, and Farmer's bodycams capture the footage of the alleged dragging. Plaintiff has maintained that he was dragged on the ground. However, the bodycam footage conclusively contradicts that allegation. Each bodycam offers a different angle of the incident. Putting all of the footage together, it is clear that Plaintiff is never dragged on the ground. A couple of different times he starts to fall down, but the officers prevent him from landing on the ground. *See* Defs. Ex. M(4) 40:50-41:10; Defs. Ex. M(5) 01:30-01:36; Defs. Ex. M(9) 35:20-35:40. It is unclear from the video what causes Plaintiff to start to fall, but he maintains that it was the force of the officer pushing him towards the police vehicle. *See* ECF No. 18 at 5. The Court may assume that Plaintiff is alleging that the manner in which Officer Montesanto escorted him to the police vehicle was unnecessarily forceful, causing him to lose his balance. Plaintiff maintains

that at no time was he actively resisting arrest, and the bodycam footage does not contradict this assertion.

Again, the Court will analyze the applicability of qualified immunity by evaluating whether Officer Montesanto's alleged forceful escort to the police vehicle violated clearly established constitutional law. Prior to 2019, it was clearly established law that an officer's significant use of entirely gratuitous force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others violated the Fourth Amendment. *See Jones*, 963 F.3d at 226. The Second Circuit has said that a significant degree of force is one that has "a variety of incapacitating and painful effects." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). The Second Circuit has also said that significant use of force includes "pepper spray, taser, or any other similar use of significant force." *Jones*, 963 F.3d at 226. The focus of this analysis is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 224.

While Plaintiff alleges that Officer Montesanto used entirely gratuitous force against an arrestee who was not resisting and who posed no threat to the safety of officers, the Court concludes that it was not clearly established law at the time of arrest that forcefully escorting an arrestee to a police vehicle was a use of significant force. Moving someone to a car in a forceful manner is not akin to using pepper spray or a taser. Additionally, Plaintiff does not allege any specific, significant injury as a result of the incident, so it does not constitute a use of force that had "incapacitating and painful effects." *See Tracy*, 623 F.3d at 98. At the time of the challenged conduct, it would not have been clear to a reasonable officer that forcefully escorting an arrestee in such a manner was unlawful. As such, Officer Montesanto is entitled to qualified immunity, and the claim is dismissed.

### c. Removal from the Car

As to Plaintiff's claim related to his removal from the police vehicle at the station, the Court concludes that Officers Camacho and Baskin are not entitled to qualified immunity. Therefore, Defendants are denied summary judgment on this claim.

Again, to "determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x at 62 (summary order) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

First, the Court concludes that the facts, taken in the light most favorable to Plaintiff, could make out a violation of a constitutional law. The Court reviews a plaintiff's excessive force claim under "the Fourth Amendment standard of objective reasonableness to assess whether an officer's conduct was appropriate in light of the facts and circumstances confronting him." *Cugini*, 941 F.3d at 608. When determining whether the officer's use of force was reasonable, the Court uses the *Graham* factors, which balance "an individual's Fourth Amendment interests against countervailing governmental interests, including the severity of the crime and whether the suspect poses a safety or flight risk or resists arrest." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Additionally, the plaintiff must demonstrate that the officer "was made reasonably aware that the force used was excessive." *Id.* (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). A plaintiff may satisfy this requirement if "either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled her distress, verbally or otherwise, such that a reasonable officer would have been aware of her pain, or both." *Id.*

When viewing the facts in the light most favorable to the non-moving party, the *Graham* factors weigh in favor of Plaintiff. Plaintiff maintains that he did not actively or passively resist

arrest in any way and was not a safety risk. Officer Camacho said a few times "we're going inside" and Plaintiff continued to question why he was being arrested/detained. Defendants claim that while en route to the police station, Plaintiff told Officer Camacho that he would not leave the car until Camacho told him why he was being detained. ECF No. 55-6 at 10. Plaintiff denies saying this and no such statement is heard on the bodycam footage. Plaintiff did not move when Officer Camacho said, "we're going inside," but he did not verbally refuse to move. Further, there is no conclusive video evidence that Plaintiff did anything that would physically prevent the officers from removing him from the car. As Plaintiff maintains that he was not resisting and nothing on the video evidence conclusively contradicts this statement, the Court must accept it as true.

After saying "we're going inside" four times, Officers Camacho and Baskin began to remove Plaintiff from the police vehicle. Defs. Ex. M(4) 46:50-48:00; Defs. Ex. M(9) 41:10-42:25. After a few seconds, Plaintiff began to complain that his feet were stuck under the seat. *Id.* Plaintiff maintains that after he complained about his feet being stuck and indicated that he was in pain, the officers continued to pull him from the vehicle forcefully, causing him pain. ECF No. 18 at 6. Defendants deny this. They claim that once he said his foot was stuck, they immediately stopped pulling him from the vehicle. ECF No. 55-6 at 13. While it is hard to see exactly what happens from the bodycam footage, there is nothing in the footage that conclusively shows that Plaintiff's account of the interaction is false, so it must be accepted as true. Plaintiff alleges that he was in a great deal of pain as a result of the officers' actions, so much so that he needed medical attention. Defs. Ex. M(9) 51:55-52:00.

While the severity of the crimes alleged, including strangulation and criminal possession of a weapon, may weigh in favor of the officers, the balance of the *Graham* factors leans toward Plaintiff. At no time at the police station did he attempt to evade officers, and therefore he was not

14

a flight risk. He was also handcuffed, so there was no safety risk, and he was not actively resisting. Further, Plaintiff signaled his distress by telling the officers that his foot was stuck, which should have made the officers aware of his pain or discomfort. Under these circumstances, where officers are alleged to have continued to forcefully pull a non-resisting arrestee from a vehicle, even after he told the officers that his foot was stuck, a reasonable juror could conclude that the degree of force employed, objectively considered, was disproportionate and unwarranted and that Plaintiff has therefore established a Fourth Amendment violation.

Second, the Court concludes that the constitutional right was clearly established at the time of arrest. As discussed above, prior to 2019, it was clearly established law that an officer's significant use of entirely gratuitous force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others violated the Fourth Amendment. *See Jones*, 963 F.3d at 226. Again, the focus of this analysis is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 224.

Here, there is a genuine dispute as to the material facts of what happened. However, at this stage, the Court must accept Plaintiff's allegations as true. Plaintiff alleges that as a result of the officers pulling him from the police vehicle, his ankle was injured and he required medical attention. This suggests that the officers' use of force was significant. If Plaintiff's allegations are true, it should have been clear to a reasonable officer that his conduct was unlawful. As of 2019, no reasonable police officer could have believed that continuing to use significant force to pull a non-resisting arrestee, who posed no threat to safety, from a police vehicle after he complained that his foot was stuck and indicated that he was in pain was lawful conduct. *See Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987) (holding that allegations that officers yanked an arrestee out of her car, threw her against it, and twisted her arm behind her back were sufficient to survive

summary judgment); *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 618–19 (E.D.N.Y. 2013) (holding that a reasonable jury could find that officers used excessive force when an officer forcibly dragged a plaintiff who was not actively resisting arrest "from his vehicle, shoved him against it, and handcuffed him behind his back"). Therefore, Defendants are not entitled to summary judgment.

### III. Third Claim: False Arrest in Violation 42 U.S.C. § 1983

Concerning Plaintiff's claim for false arrest, the Court concludes that Defendants had probable cause to arrest Plaintiff and thus are entitled to summary judgment on the claim.

The existence of probable cause to arrest "is a complete defense to an action for false arrest." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks omitted). Therefore, there "can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Probable cause is established "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* at 119 (citation and internal quotation marks omitted).

Absent circumstances that raise doubts as to a victim's veracity, it is "well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation and internal quotation marks omitted). Consequently, when making probable cause determinations, law enforcement officials are entitled to rely on both the victims' allegations that a crime has been committed as well as allegations of other police officers. *Id.*; *see Singer*, 63 F.3d at 119; *Bernard v. United States*, 25 F.3d 98, 102–03 (2d Cir. 1994). The Second Circuit has said that "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not

required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth*., 124 F.3d 123, 128 (2d Cir. 1997).

In this case, the Court concludes that there was probable cause to arrest Plaintiff because officers relied on Karry Farnsworth's statements as the basis for their belief that an offense had been committed by Plaintiff. There is no dispute that a 911 call was made from 14 Clinton Street, and that Officer Camacho, Officer Hickey, and Sgt. Felice were dispatched to the address. ECF No. 55-6 at 1–2. Plaintiff maintains that the allegations made by Karry Farnsworth in her statements are false but does not dispute that she made those statements to police. *Id.*

Officer Camacho's bodycam footage shows police arriving at the scene and encountering a visibly distraught woman, who is later identified as Karry Farnsworth. Defs. Ex. M(4) 00:43-01:33. Karry tells police that she was sleeping when her son, D.C., called her from upstairs, saying that Plaintiff was "shitfaced and cutting himself." *Id.* She then tells police that she came downstairs, and Plaintiff attacked her, smashed her phone, smashed her son's phone, and smashed her son's Xbox. *Id.* Specifically, she alleged that Plaintiff put his hands around his throat and jumped on top of her. *Id.* She then explains that when she got the Plaintiff off of her, her son tried to help, and Plaintiff began attacking him as well. *Id.*

At this point, there was probable cause to make an arrest. Plaintiff alleges no circumstances that would raise doubts as to Karry's veracity. She told police her account of what had happened that night, which was information sufficient to warrant a person of reasonable caution in the belief that an offense had been committed by Plaintiff. Police can rely on victim's statements in making a determination of probable cause and need not eliminate every plausible claim of innocence prior to making that arrest. *See Singer*, 63 F.3d at 119; *Ricciuti*, 124 F.3d at 128. Thus, even assuming Plaintiff's claim that police did not corroborate Karry's statement and Plaintiff's claim that the

17

arrest was made prior to the domestic incident report being completed, there was still probable cause. *Accord Ricciuti*, 124 F.3d at 128; *Curley v. Vill. of Suffern*, 268 F.3d 65, 69–70 (2d Cir. 2001); *Thompson v. Kline*, 504 F. Supp. 3d 200, 209 (W.D.N.Y. 2020).

Plaintiff also appears to argue that the officers at the scene of the arrest did not know if or what criminal charges were being brought against Plaintiff, and therefore they did not have probable cause to arrest him. Plaintiff cites Officer Baskin's response to Plaintiff that they were "still figuring out the charges" as evidence of this. ECF No. 55-6 at 19. However, knowing the exact charges or knowing if charges are going to be filed is not necessary for probable cause to exist. The Second Circuit, has said that a "claim for false arrest turns only on whether probable cause existed to arrest a defendant… it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). It emphasized that "when faced with a claim for false arrest, we focus on the validity of the *arrest,* and not on the validity of each charge." *Id.* Officers are allowed to rely on the allegations of other police officers in making probable cause determinations. *See Bernard,* 25 F.3d at 102–03. Further, the Supreme Court has never held that an officer is constitutionally required to inform a person of the reason for his arrest at the time he is taken into custody. *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004).

Officer Camacho and other officers at 14 Clinton Street heard Karry Farnsworth's and D.C.'s statements earlier that evening. Thus, they had probable cause to make the arrest and other officers were entitled to rely on their allegations. *See Bernard,* 25 F.3d at 102–03. It is irrelevant if the exact charges were known at the time the arrest was made. It is also irrelevant that Officer Baskin could not or did not tell Plaintiff exactly what he was being arrested for because he was not

constitutionally required to do so. *See Devenpeck,* 543 U.S. at 155. Because there was probable

cause to make the arrest, summary judgment is granted to the Defendants on this claim.

## IV.    Fourth Claim: Deliberate Indifference to Physical Harm in Violation of 42 U.S.C. § 1983

The Court grants Defendants summary judgment on Plaintiff's claim for deliberate

indifference to physical harm.

While Plaintiff does not explicitly say that he is making this claim under *Monell*, all of the

caselaw cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment relates to *Monell*. *See* ECF No. 55-7 at 19 –20. The Court therefore construes

the claim as attempting to establish municipal liability for deliberate indifference under *Monell.*

For the reasons discussed in Section VI, *infra*, this claim is dismissed.

## V.    Fifth Claim: Deliberate Indifference to Safety/Medical Needs in Violation of 42 U.S.C. § 1983

Plaintiff makes two allegations in his claim for deliberate indifference to safety/medical

needs. First, Plaintiff alleges that Defendants delayed calling for and getting him medical attention.

ECF No. 55-7 at 20. Second, Plaintiff alleges that Defendants told medical staff at the hospital as

well as the EMTs that he was injured running from the police and through the woods and that he

was a suspect in a domestic violence case. *Id.* Plaintiff alleges that these statements could have

"drastically and adversely affected" Plaintiff's medical care. *Id.*

The Court analyzes a pretrial detainee's deliberate indifference to medical needs claim

under the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Under the

Fourteenth Amendment, there is a two-prong deliberate indifference test, and each prong must be

satisfied to state a claim. *Id.* First, there is the "objective prong," which requires a showing that

"the challenged conditions were sufficiently serious to constitute objective deprivations of the right

to due process." *Id.* Second, there is a "subjective prong," which requires a "showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.*

### a. Delay In Calling and Receiving Medical Attention

The Court concludes that Defendants are entitled to summary judgment on the claim related to the delay in medical treatment.

First, the Court starts by analyzing the objective prong of the deliberate indifference test. To meet the objective prong for a claim of deliberate indifference to serious medical needs, the plaintiff must show that he actually did not receive adequate care and that the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on other grounds by Kravitz v. Purcell*, 87 F.4th 111 (2d Cir. 2023). When the basis for a detainee's claim "is a temporary delay or interruption in the provision of otherwise adequate medical treatment," the Court examines whether the delay itself created a risk of harm. *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). In considering whether a delay caused a risk of harm, a court may consider "[t]he absence of adverse medical effects or demonstrable physical injury." *Id.* at 187.

In *Valdiviezo v. Boyer*, the plaintiff alleged that the defendants had acted with deliberate indifference to his medical needs because they delayed calling for medical help and the medical help did not arrive for an hour. 752 F.App'x. 29, 32 (2d Cir. 2018) (summary order). In that case, the plaintiff alleged that he remained in pain during the hour-long wait, but the Second Circuit said that pain alone was insufficient to satisfy the objective prong. *See id.* Instead, it held that the district court correctly dismissed the claim because the plaintiff did not allege that the delay exacerbated his injury in any way. *Id.*

20

Here, just like in *Valdiviezo*, Plaintiff has alleged deliberate indifference to medical needs due to the approximately fifteen-minute delay in calling for medical treatment and approximately twenty-five-minute delay in receiving medical treatment. He has also alleged that he was in pain during the delay. However, he has not alleged that the delay exacerbated his injury in any way. Therefore, Plaintiff fails to satisfy the objective prong, and the claim is dismissed.

### b.  Comments Made to Medical Staff

The Court also concludes that Defendants are entitled to summary judgment on the claim related to the comments made to medical staff. Again, the Court starts by analyzing the objective prong of the deliberate indifference test. As a part of this inquiry, the court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause" the plaintiff. *Salahuddin*, 467 F.3d at 279.

In this case, the alleged inadequacy of conduct is that Defendants made comments to medical staff. Plaintiff speculates that these comments "could have drastically and adversely affected" his medical care, but he fails to allege any specific harm that occurred as the result of these comments. *See* ECF No. 55-7 at 20. As such, Plaintiff has failed to satisfy the objective prong, and this claim is dismissed. *See F.D.I.C.*, 607 F.3d at 292 (a non-moving party "may not rely on conclusory allegations or unsubstantiated speculation" at the summary judgment stage (quotation omitted)).

## VI.  Sixth Claim: *Monell* Municipal and Supervisory Liability

The Court grants summary judgment to Defendants on Plaintiff's *Monell* claims. Under *Monell*, a plaintiff may establish municipal liability in several ways, including by presenting evidence of

1) an express policy or custom, 2) an authorization of a policymaker of the unconstitutional practice, 3) failure of the municipality to train its employees, which exhibits a "deliberate indifference" to the rights of its citizens, or 4) a practice of the municipal employees that is "so permanent and well settled as to imply the constructive acquiescence of senior policy-making officials."

*Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 71–72 (2d Cir. 1999)).

Plaintiff has failed to proffer any evidence that would establish municipal liability under *Monell.* The only evidence he cites is: (1) Officer Baskin had been disciplined for taking exception to a Geneva Councilmember's protest against GPD in 2020 (after the events of this case); (2) Officer Montesanto was convicted of a crime in connection to his use of force on another arrestee that occurred in July 2019 (after the events of this case); (3) Sgt. Bielowicz did nothing while acts of excessive force and false arrest took place; and (4) neither Officer Camacho nor Officer Baskin followed their training with respect to use of force when pulling Plaintiff from the police vehicle. ECF No. 55-7 at 20, 22.

Plaintiff does not point to any specific policy, custom, or inadequacy in training as the basis for his claim. He also does not indicate that any policymaker authorized an unconstitutional practice. Plaintiff alleges that there was a practice of denying constitutional rights, but no reasonable juror could find that the evidence cited by Plaintiff—one instance of discipline that happened after the events of the case, a use of force that happened after the events of the case, an unsupported claim for failure to intervene, and one instance of employees not following their training—supports a finding that the practice of the municipal employees was "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials." *Pangburn*, 200 F.3d at 71–72 (2d Cir. 1999); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under

*Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"); *Missel v. Cnty. of Monroe*, 351 F.App'x. 543, 546 (2d Cir. 2009) (holding that conclusory and speculative allegations absent any factual allegations to support them are insufficient to state a *Monell* claim) (summary order). Therefore, Plaintiff's sixth claim is dismissed.

## VII.   Seventh, Eighth, and Ninth Claims: State Law Negligence, State Law Negligent Hiring, and State Law Respondeat Superior

The Court grants summary judgment to Defendants on Claims Seven, Eight, and Nine. Defendants contend that Plaintiff's seventh and eighth claims are time barred. *See* ECF No. 51-30 at 16. They also contend that there is no stated claim for negligence on which to base Plaintiff's ninth claim for respondeat superior. *See* ECF No. 51-30 at 20. In his Opposition to Defendants' Motion for Summary Judgment, Plaintiff took no position with respect to Defendants' motion on the New York State Law claims. ECF No. 55-7 at 19. Again, when a party is counseled, a court may infer from a party's partial opposition that relevant claims or defenses not defended in the opposition have been abandoned. *See Jackson*, 766 F.3d at 198.

Here, Plaintiff is counseled and by taking no position on the state law claims, did not defend these claims. As Plaintiff did not defend these claims, the Court considers them abandoned, and they are dismissed.

## VIII.   Tenth Claim: Failure to Intervene

The Court also grants summary judgment to Defendants on the failure to intervene claim. While it is unclear from Plaintiff's complaint which Defendants failed to intervene, the Court does not need to resolve that ambiguity because, as discussed above, Defendants are entitled to qualified

immunity for the alleged excessive force in handcuffing and dragging to the police car. Thus, there can be no failure to intervene claim.

As for the failure to intervene claim related to the force used to pull Plaintiff from the police vehicle at the station, there were no other officers present when Officers Baskin and Camacho removed Plaintiff from the vehicle. An officer may not be held liable for failure to intervene unless he had a "realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As no officers were present when the alleged excessive force occurred, no officer had a realistic opportunity to intervene, and therefore Defendants are entitled to summary judgement on Claim Ten.

## IX.     Punitive Damages

The Court declines to strike Plaintiff's request for punitive damages. "Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiff's proof of 'sufficiently serious misconduct.'" *Phelan ex rel. Phelan v. Torres*, No. 04–CV–3538, 2005 WL 4655382, at *15 (E.D.N.Y. Sept. 20, 2005) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Further, where the plaintiff "has provided sufficient evidence to overcome summary judgment with respect to excessive force, the Court cannot state as a matter of law that the [plaintiff] is not entitled to punitive damages." *Lazaratos v. Ruiz*, No. 00–CV–2221, 2003 WL 22283832, at *9 (S.D.N.Y. Sept. 30, 2003). Therefore, the Court denies Defendants' motion to strike Plaintiff's request for punitive damages.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 51) is GRANTED IN PART AND DENIED IN PART. Plaintiff's claims are DISMISSED except his § 1983 claim for excessive force against Officers Camacho and Baskin related to his removal from

24

the police vehicle. The Clerk of Court is directed to terminate the City of Geneva, the City of Geneva Police Department, City of Geneva Chief of Police Michael J. Passalacqua, Police Officer Jack Montesanto, and Sgt. William Belowicz as defendants. The Court sets a status conference for October 29 at 10:30am to hear from the parties about the progress of this action.

IT IS SO ORDERED.

Dated: September 25, 2024

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York